**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CASSIDY GREEN, | ) | |
| | ) | Case No. 18-cv-5858 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| OFFICER ALFONSO VALDEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The parties tried this case before the Court in a one-day bench trial on May 16, 2022. This Memorandum Opinion and Order sets forth the Court's findings of fact and conclusions of law as required under Federal Rule of Civil Procedure 52(a). For the following reasons, the Court concludes pro se plaintiff Cassidy Green did not establish by a preponderance of the evidence that defendant Officer Alfonso Valdez used excessive force in violation of the Fourth Amendment when effecting Mr. Green's arrest, pursuant to an arrest warrant, on April 25, 2018.

**Introduction**

On October 11, 2019, the Court recruited attorneys from the law firm of Vedder Price, PC to represent Mr. Green due to his mental health issues and the potential complexity of the case. Recruited counsel assisted Mr. Green through February 2022 and prepared this case for trial. Specifically, in January 2022, the Court held the final pretrial conference and ruled on the parties' motions in limine in advance of the February 22, 2022 jury trial date. In mid-February 2022, Mr. Green decided he did not want counsel to represent him. After discussing Mr. Green's reasons and counsel's responses, the Court granted counsel's motion to withdraw and struck the jury trial date. In March 2022, the Court denied Mr. Green's new request for attorney representation, due in part to former counsel's exhaustive and outstanding work leading up to trial. Also, the Court noted that

recruiting counsel for an unrepresented individual in a civil lawsuit is a privilege, not a right. In April 2022, the parties agreed to a bench trial to begin on May 16, 2022. In the interim, the Court held additional pretrial conferences to discuss the parties' presentation of their trial evidence.

**Findings of Fact**

In examining Mr. Green's Fourth Amendment excessive force claim, the Court has considered the totality of the evidence presented at the May 16, 2022 bench trial, including the stipulated deposition designations, other segments of the deposition transcripts, the live testimony, and the admitted exhibits. The Court further assessed the weight to be accorded the evidence and the credibility of each witness. In determining credibility, the Court "must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity." *Khan v. Fatima,* 680 F.3d 781, 785 (7th Cir. 2012).

At trial, defendant Officer Alfonso Valdez testified that on April 25, 2018, he was the interim chief of police with the Earlville, Illinois Police Department and has twenty-three years of law enforcement experience. He was part of the Tri-County Drug Enforcement Narcotics Team ("Tri-DENT") Task Force and was aware there was an active felony warrant for Mr. Green's arrest. When he saw Mr. Green on April 25, 2018, in the Earlville trailer park where Mr. Green lived, Officer Valdez contacted dispatch of his location and approached Mr. Green, who was in a parked car. Officer Valdez informed Mr. Green he had a warrant for his arrest, after which Mr. Green opened door, threw the car in reverse, and in doing so, hit another vehicle. Mr. Green then drove to his trailer home in reverse. Officer Valdez saw Mr. Green exit the vehicle and run into the trailer. This testimony is corroborated by the stipulated deposition testimony of Michelle Nash, Mr. Green's mother, who was in the car with her son when he drove in reverse and ran into the trailer.

Meanwhile, Officer Valdez testified that he repeatedly asked Mr. Green to stop and told him that he was under arrest. Officer Valdez stated that once Mr. Green was inside the trailer home, he ran into the bathroom. Officer Valdez followed. Once in the bathroom, Officer Valdez saw Mr. Green sitting on the toilet and reaching behind the toilet tank, but could not see what he was doing, so he asked Mr. Green to put his hands where he could see them. Mr. Green refused to show his hands. Officer Valdez testified that at that time, he feared for his safety because of the possibility that Mr. Green was reaching for a weapon. Officer Valdez then pulled his taser and asked Mr. Green to show his hands, but Mr. Green reached for the toilet tank again. Officer Valdez then tased Mr. Green in the chest, after which Mr. Green fell into the bathroom tub for about two to three seconds. The officer then attempted to arrest Mr. Green, who immediately stood up and tackled Officer Valdez resulting in the toilet tipping over spilling water. Based on Mr. Green's reaction to being tased, Officer Valdez concluded that Mr. Green had not been immobilized by the taser. Instead, Mr. Green continued to pull away and resist arrest.

Thereafter, Officer Valdez "drive tased" Mr. Green on his calf. Officer Valdez explained that a "drive tase" does not utilize probes. At that point, Mr. Green stopped resisting and other law enforcement officers arrived. The officers tried to help Officer Valdez control Mr. Green, who then resumed shoving and pulling away. The officers pulled Mr. Green into the hallway while he was still struggling and Officer Valdez activated the taser for the third time, noting that the probes were wet. Officer Valdez testified that he tased Mr. Green, along with inadvertently "zapping" himself and another officer. He then deactivated the taser and put it away because the officers were able to subdue and arrest Mr. Green. Officer Valdez explained that he tased Mr. Green for the third time because Mr. Green would not let the officers control his hands and that he continued to physically resist arrest. Once Mr. Green was subdued, the officers took him outside of the trailer. Officer Valdez testified that his entire encounter with Mr. Green lasted two to three minutes.

LaSalle County Deputy Sheriff Doug Goebel was also at the scene of Mr. Green's arrest on April 25, 2018. In his stipulated deposition testimony, Officer Goebel stated that when he entered the trailer, there was a struggle between Officer Valdez, Mr. Green, and another law enforcement officer in the trailer's bathroom that resulted in a broken toilet. Officer Goebel stated that after the toilet was broken and Mr. Green was on the floor, both Mr. Green and Officer Goebel were tased. Officer Goebel further testified that Mr. Green was struggling and refused to be handcuffed.

At trial, Mr. Green testified that he had prior contact with Officer Valdez and knew he was a police officer. Mr. Green stated that when Officer Valdez pulled over in his vehicle, the officer did not ask him to leave his vehicle or tell him he was under arrest. He admitted that he ran to his trailer, went into the bathroom, and that Officer Valdez was yelling at him—but that the yelling was unintelligible. Mr. Green insists that Officer Valdez did not tell him to stop resisting arrest. Also, he testified that he was not resisting arrest, but instead, that he was scared for his life. Mr. Green stated that he was compliant with the arresting officers and that he was not struggling. As to the first time Officer Valdez discharged his taser, Mr. Green testified that Officer Valdez kicked down the bathroom door and tased him. According to Mr. Green, being tased caused him to fall against the bathtub, after which he hit his jaw and cracked his tooth. Furthermore, Mr. Green testified that the paramedics removed a taser prong from his body, although a responding paramedic testified that there were no taser prongs embedded in Mr. Green when she arrived at the scene.

Officer Valdez's counsel impeached Mr. Green with his deposition testimony on several occasions highlighting numerous inconsistencies in Mr. Green's trial testimony. For example, at his deposition, Mr. Green testified that he did not see Officer Valdez until the officer kicked in his bathroom door, but at trial he talked about Officer Valdez conducting a traffic stop outside of his trailer. Also, Mr. Green's version of the events shifted in relation to whether he hit another vehicle

4

while he was driving in reverse. His mother's testimony, however, was unequivocal that he crashed into another car.

Although Mr. Green testified Officer Valdez's use of force resulted in him cracking his tooth, there is contemporaneous medical evidence that contradicts this testimony. Specifically, Dr. Troy Cutler, the emergency doctor who treated Mr. Green on April 25, 2018 at St. Paul Medical Center in Mendota, Illinois stated, via his stipulated deposition testimony, that after conducting a physical exam, Mr. Green had a superficial abrasion to his left shoulder and right index finger. There were no other injuries. Dr. Cutler also testified that Mr. Green was not in distress and did not appear to be in any pain. Yet, Dr. Cutler also stated that Mr. Green received Narcan nasal spray due to a suspected narcotic overdose. Mr. Green was released that same day to the police.

Other medical evidence presented at trial includes the stipulated deposition testimony of firefighter/paramedic Jessica Ramey, who was dispatched to the trailer in Earlville after police arrested Mr. Green. Ms. Ramey was dispatched for a possible overdose. She testified that Officer Valdez informed her that Mr. Green had put something in his mouth that looked like drugs, although Mr. Green denies that he put anything in his mouth. At that time, Ms. Ramey performed a general health examination and determined that Mr. Green was not physically injured, although she reported that his behavior was very combative and verbally abusive. Mr. Green, on the other hand, testified that he was compliant with the paramedics. Ms. Ramey further testified that someone from her crew asked Mr. Green to spit out what was in his mouth. When Mr. Green refused to do so, Ms. Ramey attempted to obtain the item, which she described as looking like brown paper, with a bite stick. She testified that when she inserted the bite stick into Mr. Green's mouth, he bit down and twisted his teeth, causing his tooth to crack and bleed.

**Standard of Decision**

When an action is "tried on the facts without a jury," the district court must "find the facts

5

specially and state its conclusions of law separately." *See* Fed.R.Civ.P. 52(a)(1). Also under Rule 52(a), "the judge must indicate the reasoning process that connects the evidence to the conclusion." *Zhao v. United States*, 963 F.3d 692, 700 (7th Cir. 2020) (citation omitted). While the district court "need not address each piece of evidence, the court must include sufficient subsidiary facts so that [the Seventh Circuit] can clearly understand the steps by which it reached its ultimate conclusion." *Xodus v. Wackenhut Corp.,* 619 F.3d 683, 686 (7th Cir. 2010).

**Governing Law**

"Although police officers may use force to seize another person under appropriate circumstances, the Fourth Amendment protects against the use of excessive force." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). Courts evaluate excessive force claims under an objective reasonableness standard, namely, "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The *Graham* standard is fact-intensive, asking whether each use of force was reasonable under the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (citation omitted). The *Graham* Court further explained "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Police officers cannot use significant force, like a taser, against non-resisting arrestees, however, an officer's use of a taser against an actively-resisting arrestee may be considered constitutionally reasonable under the *Graham* standard. *See Dockery v. Blackburn*, 911 F.3d 458, 467

(7th Cir. 2018); *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011). Examples of active resistance include "kicking and flailing," "declining to follow instructions while acting in a belligerent manner," and "swatting an arresting officer's hands away while backpedaling." *Dockery,* 911 F.3d at 467 (citations omitted).

**Conclusions of Law**

Mr. Green's inconsistent and shifting testimony, along with his inability to remember pertinent facts surrounding his April 2018 arrest, do not overcome the credible witness testimony contradicting his testimony. For example, Mr. Green's testimony that he was not resisting arrest was refuted by not only Officer Valdez's testimony, but by Officer Goebel's testimony that Mr. Green was struggling and refused to be handcuffed. Other inconsistencies include Mr. Green's testimony that he cracked his tooth after Officer Valdez tased him—testimony that was refuted by the testimony of Dr. Cutler and the paramedic attending to his needs on the way to the hospital. As such, the Court discounts much of Mr. Green's trial testimony as not credible. *See Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it.").

The Court turns to Mr. Green's excessive force claim, starting with the *Graham* factors. Keeping in mind that Officer Valdez's encounter with Mr. Green lasted no more than two to three minutes, unrefuted trial testimony shows Mr. Green was actively resisting arrest by fleeing from Officer Valdez when the officer attempted to arrest him outside of his home. Once inside the trailer, there is credible, corroborated testimony that Mr. Green struggled, refused to follow Officer Valdez's instructions to put his hands out where the officer could see them, and that he refused to be handcuffed. Mr. Green was not subdued until Officer Valdez discharged his taser for the third time because the prior two taser discharges did not immobilize or subdue him. As such, each deployment of the taser was justified because the first and second times did not alter Mr. Green's

combative behavior. *See Dockery*, 911 F.3d at 468. In short, Mr. Green "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action." *Norris*, 640 F.3d at 303.

As to the immediate threat to the safety of the officers or others, Officer Valdez testified he feared for his safety when Mr. Green reached behind the toilet tank because the officer did not know if Mr. Green was reaching for a weapon, although, in the end, no gun was recovered. In addition, during his arrest, Mr. Green exhibited behavior consistent with an attempt to discard drug evidence while he was on the toilet and when he put something in his mouth. Next, in relation to the severity of the crime, it is undisputed that there was a drug-related felony warrant for Mr. Green's arrest. Trial testimony also shows that Mr. Green struck another vehicle when he was resisting arrest and left the scene of that accident.

Under the circumstances, Officer Valdez's actions, including the use of his taser, were objectively reasonable given Mr. Green's repeatedly resisted arrest, failure to follow reasonable police commands, the severity of his crime, and his threat to the safety of the officers. As such, Mr. Green has not shown, by a preponderance of the evidence, that Officer Valdez violated the Fourth Amendment by using excessive force to effect his arrest. Instead, Officer Valdez used as much force as was reasonably necessary to subdue and arrest Mr. Green. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force is only reasonable when exercised in proportion to the threat posed."). Because Mr. Green has failed to establish a constitutional deprivation, the Court need not address Officer Valdez's qualified immunity argument. *Krapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 715 (7th Cir. 2014).

## Conclusion

For these reasons, plaintiff Cassidy Green did not establish by a preponderance of the evidence that defendant Officer Alfonso Valdez used excessive force when effecting his arrest on

April 25, 2018.   Civil case terminated.

IT IS SO ORDERED.

Date: 5/24/2022

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge