UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CASSIDY GREEN, ) | |
| ) | Case No. 18-CV-5858 |
| Plaintiff, ) | |
| ) | Judge Sharon Johnson Coleman |
| v. ) | |
| ) | |
| OFFICER ALFONSO VALDEZ, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

After conducting a bench trial, the Court issued a written order on May 24, 2022, concluding pro se plaintiff Cassidy Green had not established by a preponderance of the evidence that defendant Officer Alfonso Valdez used excessive force in violation of the Fourth Amendment when effecting Mr. Green's arrest on April 25, 2018. The Court presumes familiarity with the May 24, 2022 Memorandum, Opinion, and Order. Before the Court is Mr. Green's motion for a new trial brought pursuant to Federal Rule of Civil Procedure 59(a). For the following reasons, the Court, in its discretion, denies Mr. Green's motion.

**Background**

At the bench trial, defendant Officer Alfonso Valdez testified that on April 25, 2018, he was the interim chief of police with the Earlville, Illinois Police Department and was aware there was an active felony warrant for Mr. Green's arrest. When he saw Mr. Green on April 25 in the Earlville trailer park where Mr. Green lived, Officer Valdez contacted dispatch of his location and then approached Mr. Green, who was in a parked car. Officer Valdez informed Mr. Green he had a warrant for his arrest, after which Mr. Green opened door, threw the car in reverse, and in doing so, hit another vehicle. Mr. Green then drove to his trailer home in reverse. Officer Valdez saw Mr. Green exit the vehicle and run into the trailer. This testimony is corroborated by the stipulated

deposition testimony of Michelle Nash, Mr. Green's mother, who was in the car with her son when he drove in reverse and hit another vehicle.

Officer Valdez further testified he repeatedly asked Mr. Green to stop and told him he was under arrest. Officer Valdez stated once Mr. Green was inside the trailer home, Mr. Green ran into the bathroom and Officer Valdez followed. Once in the bathroom, Officer Valdez saw Mr. Green sitting on the toilet and reaching behind the toilet tank, but could not see what he was doing, so he asked Mr. Green to put his hands where he could see them. Mr. Green refused to show his hands. At that time, Officer Valdez feared for his safety because of the possibility that Mr. Green was reaching for a weapon. Officer Valdez then pulled his taser and asked Mr. Green to show his hands, but Mr. Green reached for the toilet tank again. Officer Valdez then tased Mr. Green in the chest, after which Mr. Green fell into the bathroom tub for about two to three seconds. Then, Officer Valdez attempted to arrest Mr. Green, who immediately stood up and tackled Officer Valdez resulting in the toilet tipping over and spilling water. Based on Mr. Green's reaction to being tased, Officer Valdez concluded he had not been immobilized by the taser.

Thereafter, Officer Valdez "drive tased" Mr. Green on his calf. At that point, Mr. Green stopped resisting and other law enforcement officers arrived. The officers tried to help Officer Valdez control Mr. Green, who then resumed shoving and resisting arrest. The officers pulled Mr. Green into the hallway while he was still struggling and Officer Valdez activated the taser for the third time, noting the probes were wet. Officer Valdez testified he tased Mr. Green, along with inadvertently "zapping" himself and another officer. He then deactivated the taser and put it away because the officers were able to subdue and arrest Mr. Green. Officer Valdez explained he tased Mr. Green for the third time because Mr. Green would not let the officers control his hands and that he continued to physically resist arrest.

At trial, Mr. Green testified when Officer Valdez came over in his vehicle, the officer did not ask him to leave his vehicle or tell him he was under arrest. He testified that he ran to his trailer, went into the bathroom, and that Officer Valdez was yelling at him—but his yelling was unintelligible. Mr. Green insists Officer Valdez did not tell him to stop resisting arrest. Also, he testified he was not resisting arrest, but instead he was scared for his life. Mr. Green stated he was compliant with the arresting officers and was not struggling. As to the first time Officer Valdez discharged his taser, Mr. Green testified that being tased caused him to fall against the bathtub, after which he hit his jaw and cracked his tooth. Mr. Green also testified that paramedics removed a taser prong from his body, although a responding paramedic testified there were no taser prongs embedded in Mr. Green when she arrived at the scene.

Officer Valdez's attorney impeached Mr. Green with his deposition testimony on several occasions highlighting numerous inconsistencies in Mr. Green's trial testimony. For example, at his deposition, Mr. Green testified he did not see Officer Valdez until the officer kicked in his bathroom door, but at trial he talked about Officer Valdez conducting a traffic stop outside of his trailer. Mr. Green's version of the events also shifted in relation to whether he hit another vehicle while he was driving in reverse. His mother's testimony, however, was unequivocal that he crashed into another car.

Although Mr. Green testified Officer Valdez's use of force resulted in him cracking his tooth, there is contemporaneous medical evidence that contradicted this testimony. To explain, the stipulated deposition testimony of firefighter/paramedic Jessica Ramey, who was dispatched to the trailer in Earlville after police arrested Mr. Green, revealed that Officer Valdez informed her that Mr. Green had put something in his mouth, which looked like drugs. At that time, Ms. Ramey performed a general health examination and determined Mr. Green was not physically injured, although she reported his behavior was very combative and verbally abusive. Ms. Ramey further

3

testified someone from her crew asked Mr. Green to spit out what was in his mouth. When Mr. Green refused to do so, Ms. Ramey attempted to obtain the item with a bite stick. She testified when she inserted the bite stick into Mr. Green's mouth, he bit down and twisted his teeth, which caused his tooth to crack and bleed.

**Legal Standard**

Courts grant new trials under Rule 59(a) only if "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 812 (7th Cir. 2021) (citation omitted). A verdict will be set aside only if no rational jury could have rendered it. *See Bowers v. Dart*, 1 F.4th 513, 521 (7th Cir. 2021). District courts have considerable discretion in ruling on Rule 59(a) motions. *See Lewis v. McLean*, 941 F.3d 886, 891 (7th Cir. 2019).

**Discussion**

Construing Mr. Green's pro se post-trial motion liberally, *Santiago v. Streeval*, 36 F.4th 700, 710 (7th Cir. 2022), he argues the trial evidence was so overwhelmingly in his favor that any reasonable jurist would have found Officer Valdez used excessive force. Specifically, Mr. Green asserts that legal precedent makes clear Officer Valdez's taser use violated his rights because he was not resisting arrest. Mr. Green bases his argument on his own trial testimony, which the Court, in its discretion, found not credible. *See Trade Well Int'l* v. *United Central Bank*, 825 F.3d 854, 860 (7th Cir. 2016).

As the Court explained in its May 24, 2022 Memorandum, Opinion, and Order, Mr. Green's inconsistent and shifting testimony, along with his inability to remember pertinent facts surrounding his April 2018 arrest, did not overcome the credible witness testimony contradicting his testimony. For example, Mr. Green's testimony that he was not resisting arrest was refuted by not only Officer Valdez's testimony, but by another officer's testimony that Mr. Green was struggling and refused to

4

be handcuffed. Other inconsistencies include Mr. Green's testimony that he cracked his tooth after Officer Valdez tased him—testimony that was refuted by the paramedic attending to his needs on the way to the hospital. Thus, Mr. Green's first argument based on his own testimony fails because his testimony lacked credibility.

Mr. Green also contends there was video footage of the incident that supported his version of the facts and that this video footage was either not turned over to him or destroyed, which he argues is a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady*, prosecutors in criminal cases must disclose material exculpatory information to criminal defendants. *See Sandefur v. Dart*, 979 F.3d 1145, 1155 (7th Cir. 2020). The constitutional protections *Brady* affords apply to criminal defendants, not civil litigants, therefore, Mr. Green's *Brady* argument is without merit. *See Millspaugh v. County Dept. of Public Welfare of Wabash Cty.*, 937 F.2d 1172, 1175 (7th Cir. 1991); *Perez v. Wallis*, 77 F.Supp.3d 730, 747 (N.D. Ill. 2014) (Castillo, J.). Equally without merit is Mr. Green's reliance on *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), because he was not a pretrial detainee at the time Officer Valdez arrested him in April 2018.

Next, Mr. Green asserts that at the bench trial the Court repeatedly "silenced" him, which interfered with his ability to present a meaningful argument. At trial, the Court painstakingly applied the Rules of Evidence when the parties presented their evidence and arguments. At times, the Court admonished both sides when necessary so the presentation of evidence was proper. The Court has broad discretion when making such evidentiary determinations. *See United States v. Bell*, 28 F.4th 757, 762 (7th Cir. 2022). In addition, the Court repeatedly explained to Mr. Green the appropriate trial protocol and provided Mr. Green with numerous opportunities to present his case. Under these circumstances, Mr. Green's argument is factually baseless.

Mr. Green further maintains the Court committed error by not considering his mental illness and recent hospitalizations when denying his motion for recruited counsel in March 2022. By way of background, on October 11, 2019, the Court recruited attorneys from the law firm of Vedder Price, PC to represent Mr. Green due to his mental health issues and the potential complexity of the case. Recruited counsel assisted Mr. Green through February 2022 and prepared this case for a jury trial. While Mr. Green had appointed counsel, the Court held the final pretrial conference and ruled on the parties' motions in limine in advance of the February 22, 2022 jury trial date. In mid-February 2022, Mr. Green, however, decided he did not want counsel to represent him. After discussing Mr. Green's reasons and counsel's responses, the Court granted counsel's motion to withdraw and struck the jury trial date. In March 2022, the Court denied Mr. Green's request for attorney representation, due in part to former counsel's exhaustive and outstanding work leading up to trial.

There is no right to court-appointed counsel in civil litigation. *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021). "However, the district court does have the discretion to recruit a volunteer to represent a plaintiff who cannot otherwise afford counsel" relying "on the generosity of lawyers to volunteer their time and skill on behalf of indigent civil parties." *Giles v. Godinez*, 914 F.3d 1040, 1052 (7th Cir. 2019). As discussed, Mr. Green was represented by outstanding court-appointed lawyers until the eve of his jury trial. These lawyers were in communication with Mr. Green throughout their representation of him, which spanned over two years. During that time, they successfully defeated a Rule 12(b)(6) motion to dismiss, engaged in extensive written and oral discovery, hired an expert witness, presented motions in limine, and prepared for trial. Before counsel filed their motion to withdraw, they communicated with Mr. Green about his case and their representation. They did not want to withdraw, but instead sincerely wanted to represent Mr. Green through trial. Accordingly, appointed counsel did not abandon Mr. Green as he now argues.

Rather, Mr. Green abandoned counsel's efforts insisting on their withdrawal. It is important to emphasize that from the communications Mr. Green attached to his March 2022 motion for attorney representation, and throughout this litigation, Mr. Green exhibited an astute understanding of the legal concepts underlying his Fourth Amendment claim, along with the procedural and evidentiary issues in his case.

When determining whether to appoint counsel for indigent litigants, courts look to two factors: (1) whether the litigant has made a reasonable attempt to get a lawyer; and (2) whether plaintiff is capable of representing himself in the context of the legal complexity of the case. *See Eagan*, 987 F.3d at 682 (citing *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc)). Although mental illness is one factor courts consider when determining whether a pro se litigant is capable of representing himself, mental illness, on its own, does not create a legal entitlement to the appointment of counsel. *See Perry v. Sims*, 990 F.3d 505, 513 (7th Cir. 2021).

With this standard in mind, the second *Pruitt* factor is at issue. As discussed on the record and in the Court's March 8, 2022 ruling, Mr. Green had the benefit of the work former appointed counsel undertook in litigating this matter and preparing for trial. Accordingly, Mr. Green was more than capable of representing himself at the bench trial, especially because much of the evidence was presented through agreed upon designated depositions submitted by Mr. Green's appointed counsel. His mental health issues did not affect his ability to continue to trial and present his case. As such, the Court did not abuse its discretion in denying Mr. Green's March 8, 2022 motion for attorney representation. And, even if the Court had abused its discretion, Mr. Green has not demonstrated that there was a "reasonable likelihood that the presence of counsel would have made a difference in the outcome of the litigation," *Pruitt*, 503 F.3d at 659, especially because his own trial testimony lacked veracity.

Next, Mr. Green contends the Court erred in failing to hold LaSalle County Sheriff Deputy John Underhill, expert witness Geoffrey Albert, LaSalle County Deputy Sheriff Doug Goebel, and Officer Vesely in contempt for failing to appear and testify at a hearing or trial. Because Mr. Green did not raise this argument before or during trial, it is waived. *See Fifth Third Mortgage Company v. Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019).

Moreover, Mr. Green's argument that the Court erred by not awarding punitive damages is misplaced because Mr. Green was not successful in establishing his excessive force claim and did not establish that Officer Valdez's conduct was reckless or callously indifferent to Mr. Green's federally protected rights. *See Green v. Howser,* 942 F.3d 772, 781 (7th Cir. 2019).

On a final note, Mr. Green's argument that cumulative errors warrant a new trial is unpersuasive because "the cumulative effect of various non-errors does not, and cannot, amount to error warranting a new trial." *Farnik v. City of Chicago*, 1 F.4th 535, 542 (7th Cir. 2021).

**Conclusion**

For these reasons, the Court, in its discretion, denies plaintiff's Rule 59(a) motion for a new trial [225].

IT IS SO ORDERED.

Date: 7/15/2022

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge